UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| SOUTH DAKOTA BOARD OF REGENTS on behalf of BLACK HILLS STATE UNIVERSITY,<br><br>         Plaintiff and<br>         Counterclaim<br>         Defendant,<br><br>  vs.<br><br>GLOBAL SYNTHETICS ENVIRONMENTAL, LLC, D/B/A GEO-SURFACES,<br><br>         Defendant,<br>         Counterclaim<br>         Plaintiff and Third-<br>         Party Plaintiff,<br><br>  vs.<br><br>MIDSTATE RECLAMATION S.D., INC.,[1] and FMG, Inc.,<br><br>         Third-Party<br>         Defendants. | CIV. 15-5003-JLV<br><br><br><br>ORDER |

**INTRODUCTION**

Plaintiff South Dakota Board of Regents, on behalf of Black Hills State University ("BHSU"), filed a motion for partial summary judgment, a statement of undisputed material facts with supporting exhibits and a supporting brief against defendant Global Synthetics Environmental, LLC, ("GSE"). (Dockets 40-41 & 43-44). GSE filed a brief in resistance to BHSU's motion, together with

---

[1]See order for change of name. (Docket 88).

a response to plaintiff's statement of undisputed facts with supporting exhibits. (Dockets 45-46 & 48).   Plaintiff filed a reply brief in support of its motion. (Docket 49).   For the reasons stated below, BHSU's motion for partial summary judgment is granted.

GSE filed a cross motion for summary judgment against BHSU together with a statement of undisputed material facts with supporting exhibits and a supporting brief.   (Docket 54-57).   BHSU filed a brief in resistance to GSE's motion together with a response to defendant's statement of undisputed facts with supporting exhibits.   (Dockets 78-84).   GSE filed a reply brief in support of its motion.   (Docket 85).   For the reasons stated below, GSE's motion for summary judgment is granted in part and denied in part.

Third-Party Defendant Midstate Reclamation SD, Inc., ("Midstate") filed a motion for summary judgment against GSE together with a statement of undisputed material facts and a supporting brief.   (Dockets 58-60).   GSE filed a brief in resistance to Midstate's motion together with a response to the statement of undisputed material facts with supporting exhibits.   (Dockets 70-72). Midstate filed a reply brief in support of its motion.   (Docket 76).   For the reasons stated below, Midstate's motion for summary judgment is granted.

Third-Party Defendant FMG, Inc., ("FMG") filed a motion for summary judgment against GSE together with a statement of undisputed material facts and a supporting brief.   (Dockets 63-65 & 67).   GSE filed a brief in resistance to FMG's motion together with a response to the statement of undisputed material

facts with supporting exhibits. (Dockets 73-75). FMG did not file a reply brief in support of its motion. For the reasons stated below, FMG's motion for summary judgment is denied.

## PROCEDURAL BACKGROUND

BHSU filed a complaint against GSE in state court. (Docket 1-1 at pp. 5-11). GSE timely removed plaintiff's complaint from state court. (Docket 1). GSE filed an answer and counterclaim. (Docket 6). BHSU filed a reply to the counterclaim. (Docket 7).

GSE filed unopposed motions for leave to file third-party complaints against Midstate and FMG. (Dockets 17 & 22). The court granted the motions. (Dockets 20 & 26). GSE filed third-party complaints against Midstate and FMG. (Dockets 24 & 27). Midstate and FMG filed their answers to the third-party complaints. (Dockets 29 & 35). The court entered a scheduling order setting deadlines for the completion of all discovery and filing substantive motions. (Docket 39). The parties' motions for summary judgment were all timely filed.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment if the movant can "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine issue of material fact

3

exists.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).   Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.   <u>Id.</u> at p. 248. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   <u>Id.</u> at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate.   <u>Id.</u>   However, the moving party is entitled to judgment as a matter of law if the nonmoving party failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   <u>Id.</u> at p. 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party.   <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986).   The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." <u>Anderson</u>, 477 U.S. at pp. 251-52.

## UNDISPUTED MATERIAL FACTS

The following recitation consists of the material facts developed from the complaint (Docket 1-1 at pp. 5-11), the third-party complaints (Dockets 24 & 27), the parties' answers (Dockets 6, 29 & 35), the parties' statements of undisputed material facts (Dockets 44, 55, 59 & 65), the parties' responses to opposing parties' statements of undisputed material facts (Dockets 46, 72, 74 & 79) and other evidence where indicated. Where a statement of fact is admitted by the opposing party, the court will only reference the initiating document. These facts are "viewed in the light most favorable to the [party] opposing the motion." <u>Matsushita Elec.</u> <u>Indus. Co.</u>, 475 U.S. at 587. The facts material to the parties' motions for summary judgment are as follows.

Plaintiff South Dakota Board of Regents is a South Dakota governmental entity with the power to sue and be sued on behalf of those educational institutions under its control, including Black Hills State University. (Docket 1-1 at p. 5 ¶ 1). BHSU is a state university located in Spearfish, South Dakota. <u>Id.</u> ¶ 2. Global Synthetics Environmental, LLC, is a Louisiana corporation with its principal place of business in Baton Rouge, Louisiana. <u>Id.</u> ¶ 3. Midstate Reclamation, Inc., is a Minnesota corporation with its principal place of business in Lakeville, Minnesota. (Docket 24 ¶ 4). FMG, Inc., is a South Dakota

corporation consisting of a multi-discipline engineering consulting firm in Rapid City, South Dakota. (Docket 27 ¶ 5).

On May 30, 2013, BHSU and GSE entered into a contract ("Contract") in which GSE would provide the labor, materials and equipment to install an artificial sports field consisting of a GeoGreen infilled replicated grass field on a GeoFlo drainage and shock attenuation blanket over a cement stabilized deck which was to perform as a vertical-to-horizontal draining synthetic turf system at BHSU's Lyle Hare Field (the "Project"). (Docket 1-1 at p. 6 ¶ 4; <u>see</u> <u>also</u> Dockets 24 ¶ 7; 27 ¶ 8 & 44 ¶ 4). The pertinent documents include the Contract, GSE's Proposal of May 13, 2013, the Design and Build Installation Guide Specifications, GSE's Warranty, and GSE's Maintenance Requirement Manual (the "Contract documents").[2] (Docket 44 ¶ 5).

The artificial turf system contracted for is a vertical-to-horizontal draining system comprised of the following layers, from top to bottom:

    a.   Rubber infill;

    b.   Sand infill;

    c.   Artificial grass or turf;

    d.   Backing layer;

    e.   Drainage and shock attenuation blanket; and

    f.   Base course consisting of a "cement stabilized deck."

(Docket 44 ¶ 9).

---

[2]The Contract documents appear at Docket 43-1.

Cement soil stabilization ("cement stabilization") is a commonly used method of improving the overall strength and stability of soils for use as a base, similar to granular material or aggregate bases.  Id. ¶ 10.  The process of stabilizing soil involves mixing a certain amount of cement with an amenable soil type which causes a chemical reaction to create a hard, impervious product.  Id. ¶ 11.  Cement stabilization is not appropriate for all soil types.  Id. ¶ 12.  A "mix design" is typically utilized before starting construction to determine whether cement stabilization is appropriate and, if so, the type and amount of ingredients required to achieve a desired result.  Id. ¶ 13; see also Docket 59 ¶ 14.  The mix design procedure recommends the soil to be stabilized be tested for pH, organic content and plasticity.  (Docket 44 ¶ 14; see also Docket 59 ¶ 15).  GSE determined it could achieve a proper cement stabilized deck with eight percent cement if the plasticity index of the soil material is acceptable or as determined by a geotechnical engineer.  (Docket 44 ¶ 16).

GSE required BHSU to hire an engineering firm to conduct soil tests GSE wanted performed in order to determine if a cement stabilized deck could be utilized in the field.  Id. ¶ 17.  FMG was hired by BHSU for the Project.  Id. ¶ 18.  On May 10, 2013, GSE instructed FMG as to the tests GSE wanted performed to determine if cement stabilization was appropriate on the Project. (Docket 44 ¶ 18; see also Docket 59 ¶ 11) ("Charles Dawson of GSE told FMG what to test for.").[3]  FMG had no prior experience in cement soil stabilization.

_____

[3]Charles C. Dawson is GSE's Director of Operations.  (Docket 43-1 at p. 2).

(Docket 65 ¶ 7). FMG was not asked to do a cement mix design or a soil stabilization test.[4] Id. ¶ 6. FMG sent a proposal to BHSU itemizing the tests requested by GSE and the total cost. Id. ¶ 2; see also Docket 75-1.

On May 17, 2013, GSE received FMG's report of the test results. (Docket 44 ¶ 19). FMG's testing was correctly conducted, the results were accurate and fell within the reasonable values which should be expected for the soil at the Lyle Hare Field. (Docket 65 ¶ 4). Based on FMG's report, it was not possible to determine whether the soil was suitable for cement stabilization. (Docket 59 ¶ 37).

GSE knew cement stabilization would not work in soil containing organic material. (Docket 43-5 at p. 49:2-12). GSE did not test the soil for organics. Id. at p. 95:17-19. GSE was responsible for the mix design. Id. at p. 125:17-19. Although a mix design is customarily performed on projects like the Lyle Hare Field Project, no mix design was utilized by GSE for the Project. (Docket 44 ¶ 15; see also Docket 59 ¶ 16). GSE concluded the soil was acceptable for cement stabilization. (Docket 44 ¶ 17; see also Docket 59 ¶ 4). The cement stabilization process was intended to make the soil a suitable

---

[4]GSE contends FMG, acting as a reasonable geotechnical firm, should have advised GSE that additional testing was necessary. (Docket 74 ¶ 4). Mr. Rettner, a geotechnical engineer discussed in more detail later in this order, testified FMG should have recommended GSE also run an organic content soil test and a cement compatibility test, which tests the pH of the soil and cement mixed together. (Docket 75-4 at p. 21:5-13). Mr. Rettner testified FMG also should have discussed with GSE about doing a mix design or whether GSE was going to use a standard amount of cement. Id. at p. 21:15-20.

subgrade to support the artificial turf surface on the field.   (Docket 44 ¶ 10).

After receiving FMG's report, GSE represented to BHSU that the soil at Lyle Hare

Field could be properly stabilized using the concentration of cement contained in

GSE's May 13, 2013, proposal and the Contract of May 30, 2013.[5]   (Docket

44 ¶ 22).

On June 3, 2013, GSE received Midstate's bid to perform the cement

stabilization work.   (Docket 24 ¶ 14).   On June 11, 2013, Mr. Dawson provided

Midstate's owner with a 2005 FMG report which included a proctor test

performed on the soil at Lyle Hare Field in that year.[6]   (Docket 24 ¶ 15).

On June 17, 2013, GSE entered into a subcontract with Midstate.[7]   Id.

¶ 8.   Under the subcontract, Midstate was hired to perform cement stabilization

for the Project.   Id. ¶¶ 9 and 26.   Midstate suggested to GSE that a pre-project

mix design be conducted.   (Docket 59 ¶ 19).   GSE instructed Midstate "to put

cement 8 inches deep at 8% volume" on the field but did not indicate how GSE

---

[5]GSE's proposal, which was incorporated into the Contract, recommended the base course consist of a "cement stabilized deck, 8" thick by 8% volume . . . ." (Docket 43-1 at p. 5 ¶ 3; see also Docket 59 ¶ 6).

[6]A proctor test is used to determine the total quantity of cement necessary for cement stabilization.   (Docket 59 ¶ 35).   The proctor provided to Midstate did not raise any concern as to whether the soil was suitable for stabilization or if cement stabilization would be appropriate for the Project.   Id. ¶ 36.

[7]The subcontract between GSE and Midstate is located at Docket 62-2. Midstate is not a geotechnical engineering firm and does not have a geotechnical engineer on staff.   (Docket 59 ¶ 23).   Midstate was not hired by GSE to perform any geotechnical testing or interpret test results.   Id. ¶¶ 24-25 & 32.

came to that conclusion.[8]   Id. ¶ 20.   GSE provided Midstate with no testing

information regarding the soil organic content.   Id. ¶ 34.   Ultimately, whether

to use cement stabilization was GSE's decision.   (Dockets 59 ¶ 9 and 72 ¶ 9).

On June 19, 2013, Midstate's employees began the cement stabilization

process.[9]   (Docket 24 ¶ 18).   Superintendent Doug Kahnke of Midstate's

cement stabilization division immediately noticed the soil may not be appropriate

for cement stabilization.   Id. ¶ 19.   He suspected the soil may contain too much

organic material or may not have sufficient other components to make the soil

suitable as a subgrade for the artificial turf surface.[10]   Id.   Mr. Kahnke never

expressed his concerns to anyone.   (Docket 72 ¶ 9).

Once the Project began it involved removing the natural grass,

attempting[11] cement stabilization, grading, installation of shock pad, drainage

pad, turf, markings, logo, and rubber in-fill.   (Docket 44 ¶ 23).   Grading and

compaction, which constituted the balance of the cement stabilization process,

were not activities performed by Midstate.   (Docket 59 ¶¶ 29-30; see also Docket

---

[8]Midstate's original proposal called for 230 tons of cement, but the final
subcontract set the amount of cement to be integrated in the cement
stabilization at 180 tons.   Compare, Docket 62-2 at p. 3 with 62-2 at pp. 1 & 8.

[9]The scope of Midstate's work was to broadcast the cement into the soil,
mix the soil and cement together with a reclaimer and add water as necessary.
(Docket 59 ¶ 26).

[10]GSE asserts it ultimately made the decision to use cement stabilization
based on FMG's test results and representations and the failure of Midstate to
voice the opinion of its agent that cement stabilization was inappropriate for the
project.   (Docket 72 ¶ 9).

[11]GSE acknowledges the use of the word "attempted" in this sentence.
Compare Docket 44 ¶ 23 and Docket 46 ¶ 23.

44 ¶ 25).   Midstate completed its portion of the cement stabilization work in one day.   (Docket 44 ¶ 24).

On June 19, 2013, at the request of BHSU and GSE, FMG visited the site to take moisture content and density tests on the subgrade soils during the cement stabilization process.   (Docket 75-2 at p. 1).   The average moisture content readings were used by GSE "to calculate the percentage of cement . . . required to treat . . . the subgrade soils."   Id.   After compaction of the treated subgrade soil, FMG did density testing.   Id.   Light watering and additional compaction was done and a second density test taken.   FMG was told the contractor was "targeting a completed cement treated subgrade wet density of 104.0 pounds per cubic foot."   Id.   Both of FMG's density tests "exceeded 104.0 pounds per cubic foot."   Id.   FMG's oral results were provided to BHSU and GSE with a cover letter dated June 25, 2013.   (Docket 75-2).

Grading the soil after it has been stabilized can destroy the integrity of the cement stabilization process.   (Docket 59 ¶ 38).   GSE recognized the material should not be moved around once the cement stabilization process begins.   Id. ¶ 40.   The entire grading, or layback, process should be completed within two hours.   Id. ¶ 39.   Final grading and compaction on the Project took longer than two hours and went well into June 20.[12]   Id. ¶ 41.

---

[12]The final grading and compaction process "consists of a large foot pad or sheep's foot roller compacting the newly mixed material.   This is followed by a blade to take the 'puck' marks out of the soil caused by the sheep's foot roller, followed by a smooth drum tire roller that would finish roll the top two or three inches to compact the soil."   (Docket 60 at pp. 5-6).

GSE's grading subcontractor encountered problems and failed to grade the field to the specifications required by the Contract. (Docket 44 ¶ 25). In addition to the grading problems, many soft areas ("divots") started appearing under the turf soon after construction. Id. ¶ 27.

BHSU was entitled to receive an athletic field which was fully functional and ready by the beginning of the 2013 football season. (Docket 55 ¶ 4). On September 19, 2013, BHSU's Athletic Director noticed some areas on the field which were soft and needed to be addresses as soon as possible. (Docket 57-3 at pp. 89:16-90:3). GSE agreed the field did not meet Contract specifications and returned in September 2013 to regrade part of the field. (Docket 44 ¶ 26). GSE acknowledged it became clear there were issues with the subgrade soil because of the divots which were developing. (Docket 55 ¶ 6).

On at least three occasions in the fall of 2013, GSE attempted to repair divots.[13] (Docket 44 ¶ 28). Some of the repairs did not function consistent with the expectations for the turf surfacing, with many of the seams not bonding and additional divots forming around the repaired areas.[14] Id. ¶ 29. Because

---

[13]A typical divot repair "involve[d] cutting and pulling back the artificial turf and drainage/shock mat . . . , removing the soft dirt, filling the [void] with a cement mixture . . . [and] glu[ing] the drainage/shock mat and artificial turf back into place." (Docket 41 at p. 5 n.3).

[14]GSE objected to the use of the term "majority of the repairs," but did not otherwise object to the description of the nature of the issues presented. See Docket 46 ¶ 29.

of the recurring problems with the field, BHSU withheld the final Contract payment.   Id. ¶ 30.

In November 2013, GSE was concerned about the long-term stability of the field and consulted with Midstate.   Id. ¶ 36.   Midstate recommended additional testing be performed to determine if the soil stabilization system was working as intended.   Id.   GSE never notified BHSU of GSE's concern over the cement stabilization system or the additional testing recommended by Midstate.[15]   Id. ¶ 37.   BHSU's football team played its 2013 home season on the field.   (Docket 57-4 at p. 72:19-21).

In the spring of 2014, BHSU reported to GSE that there were continuing problems with the field.   (Docket 44 ¶ 31).   GSE offered to repair the field in return for the final Contract payment.   Id. ¶ 32.   On May 12, 2014, BHSU and GSE entered into an Amendment to the Contract Agreement ("Amendment").[16]   Id.   ¶ 6.   The Amendment required GSE to:

> [C]ommence work on the Field as necessary to conform with the specifications of the . . . Contract Agreement, which shall be accomplished by [GSE] furnishing the necessary materials, labor and equipment to proceed as follows:
>
> a.   Remove "infill" from the surface of the field;
>
> b.   Remove synthetic turf and shock pads;

---

[15]GSE denies it had any obligation to disclose to BHSU the concerns GSE expressed to Midstate about the soil stabilization system or the testing which Midstate recommended.   (Docket 46 ¶ 38).

[16]The Amendment to the Contract Agreement appears at Docket 43-2.

c. Re-grade the base of the field with dual plane laser equipment;

d. Remove soft or noncompacting material and replace with compactible stone;

e. Make a final grade to tolerance as per specifications; and

f. Reinstall shock pad, turf, and infill.

(Docket 43-2 ¶ 3).   GSE was responsible for determining the means and methods to be utilized under the Amendment, subject to the completion of the work according to the Contract specifications.   Id. ¶ 7; see also Docket 44 ¶ 34. In exchange for the work to be performed, BHSU agreed to pay GSE the final amount due under the Contract on a progressive payment schedule.   (Docket 43-2 ¶ 8).

The fifth payment was due "upon completion of grading/compaction." (Docket 43-2 ¶ 8(F).   Prior to making the payment, BHSU hired Interstate Engineering to verify the grading of the field by GSE.   (Docket 57-4 at pp. 58:20-59:1).   Interstate Engineering was asked to determine whether the field "had been graded to elevation and slope by [GSE] to meet certain contract specifications."   (Docket 83 ¶ 2).   William Moths is a licensed land surveyor employed by Interstate Engineering.   Id. ¶ 1.   On May 22, 2014, Mr. Moths' e-mail to BHSU stated:

Please find the attached drawing representing the Lyle Hare Stadium Football Field surface after regrade and prior to placement of shock pad and turf. . . . Grades were blended from the side lines to the drainage channels at the edge of the track and from the end zones to the edge of the rubberized surface at each end.   I feel the [GSE] crew has provided a sub-surface that meets or exceeds the

specifications for the project and think that you will have a field to be proud of.[17]

(Docket 48-4).   Following receipt of Mr. Moths' e-mail, BHSU made the fifth progress payment to GSE on May 28, 2014.[18]   (Docket 55 ¶ 29).

Under the Amendment the final payment was to "be paid upon BHSU receiving confirmation from its consultant(s) that the field conforms to the project specifications as set forth in the Contract Agreement."   (Docket 43-2 ¶ 8(G).   There is no evidence in the record that BHSU conferred with any other consultants before making the final payment under the Amendment. BHSU made the final payment to GSE under the Amendment on May 30, 2014. (Docket 55 ¶ 34).   BHSU made all of the payments to GSE required by the Contract and the Amendment.   (Docket 44 ¶ 53).

---

[17]Mr. Moths is not a geotechnical engineer and his firm was not hired to provide any geotechnical engineering services, including soil stabilization. (Docket 83 ¶¶ 7-8).   Mr. Moths' work did not include "other contract specifications, including but not limited to, the soil characteristics or whether there were any issues with the soil stabilization process."   Id. ¶ 4.   Any implication in the e-mail that the specifications Mr. Moths was referencing were anything "other than grading of the elevation of the field would be incorrect."   Id. ¶ 5.

[18]GSE proposed a statement of undisputed fact that Mr. Moths was hired to "determine whether GSE had completed the scope of work according to the specifications . . . ."   (Docket 55 ¶ 31) (referencing Docket 57-4 at pp. 58:20-59:1).   However, it was GSE's counsel who asked the witness if Interstate Engineering was selected "to verify the grading."   (Docket 57-4 at p. 58:20-21). GSE cannot make more of the answer than its own question posed to the witness and the answer given.

On June 10, 2014, GSE "re-sent" to BHSU the warranty contained in the Contract. (Docket 55 ¶ 43). The warranty contains a "date of completion or first use" of July 25, 2013.[19] (Docket 57-12 at p. 3).

The BHSU football team began fall practice on the field on August 14, 2014. (Docket 57-13; see also Dockets 55 ¶ 44 & 79 ¶ 44). During that practice BHSU "discovered two sink holes (soft spots) similar to the ones . . . experienced in the past." (Docket 57-13). After describing the locations of the divots to GSE, BHSU's Athletic Director asked Mr. Dawson to "please send someone as soon as possible to fill and repair these two areas." Id. About August 25, 2014, GSE sent a couple of men to work on the field. (Docket 43-5 at p. 155:6-14). GSE made three trips that fall to repair areas which were failing to meet tolerances. (Docket 43-5 at p. 179:1-5). In addition, the parties agreed Tom Verhelst of Spearfish, South Dakota, would do minor repairs to the field. (Docket 80-4 at p. 1). Having Mr. Verhelst repair divots saved GSE the expense of having one of its own employees travel to South Dakota as problems surfaced. Id.

Because GSE's attempted repairs of the field were not working, BHSU hired David L. Rettner, a geo-technical engineer with vast experience in cement

---

[19]The Contract documents stated the warranty would become effective "[u]pon final acceptance or first use of the finished sports field (whichever occurs first)." (Docket 43-1 at p. 7). The court presumes July 25, 2013, signifies GSE's view of the date of completion of the project as the football team would not have been using the field until later in the summer and BHSU had not issued a final acceptance of the field. See Docket 81 ¶ 12. Acceptance by BHSU did not occur in July 2013 since BHSU withheld final payment that year.

stabilization, to assess the field and make repair recommendations.[20]   (Docket 44 ¶ 39).   Mr. Rettner conducted a site visit on August 31, 2015, and a geotechnical investigation[21] of the field on September 18, 2015.   (Docket 43-3 at pp. 5 & 10).   Mr. Rettner issued a written report dated March 2, 2016.   (Docket 43-3).   Another of BHSU's expert witnesses, W. Todd Smith, a professional engineer experienced in design and installation of artificial turf fields, conducted a site inspection on July 28-29, 2015, and issued a report dated March 9, 2016.[22]   (Docket 44 ¶ 48).

During his site inspection, Mr. Rettner made a number of observations about the condition of the field.   Those observations included the following:

1.      [S]everal dozen soft areas in the turf.   These areas were soft enough that they would deform under the load applied by foot traffic.

2.      [S]everal areas of the turf . . . were now over ½ inch below the adjacent surface which was a concern as a tripping hazard . . . .

3.      There were several areas on the field where . . . the seam tape had failed and the turf had separated . . . .

---

[20]Mr. Rettner was disclosed as one of BHSU's experts for trial.   (Docket 44 ¶ 40).   GSE joined plaintiff's disclosure, designated Mr. Rettner as GSE's expert for trial and identified his report as a summary of his testimony. (Dockets 44 ¶ 41; 46 ¶ 41 & 48-16).   GSE designated no other experts for trial and the time for doing so expired.   (Docket 44 ¶ 42; see also Docket 39 ¶ 7).

[21]"Six borings were performed to a depth of approximately 18 inches, and thin wall samples were obtained for the full depth of each boring."   (Docket 43-3 at p. 10).

[22]Mr. Smith's report is found at Docket 43-4.

4.      [T]he yard lines were no longer straight in many areas.

(Docket 43-3 at p. 5).   "During the site visit a representative soft area was cut open so [Mr. Rettner] could observe the condition of the underlying soils. . . . [I]t is . . . apparent that the seam tape used on the geo-synthetic drainage layer had failed, which was allowing soil to move upward.   This same seam failure would also allow moisture to move through the seam into the underlying soil."   Id. at p. 8.

Mr. Rettner determined the "soil that was stabilized with cement was not suitable for soil stabilization" as required by the Contract.   (Docket 44 ¶ 44) (referencing Docket 43-3 at p. 15; other reference omitted; brackets omitted). Mr. Rettner concluded:

> The addition of approximately 10% cement by weight (8% by volume) [as was done by Midstate at the direction of GSE] was insufficient for plastic soils and the presence of organic materials in the soil made the effectiveness of cement stabilization even more unlikely.[23]
>
> It is also apparent from the test results of the upper portion of the thin wall samples that the moisture content of the cement stabilized soil has increased from the 24-25% that was present during construction to an average of over 29%, indicating moisture intrusion.
>
> The soil cement material under the turf at Lyle Hare Field will continue to deteriorate over time due to continued exposure to freeze-thaw cycles, and will continue to exhibit additional soft areas as the material loses stability and is repeatedly subjected to moisture intrusion from the surface though the failed seams in the geo-synthetic drainage layer.

---

[23]This concentration of cement was recommended by GSE and incorporated into the Contract.   See footnote 5, supra.

(Docket 43-3 at pp. 15-16).   Based on Mr. Rettner's experience, he concluded "it is not possible to reuse the soil that is in-place as a stabilized base material, even with the incorporation of additional cement.   We recommend removal of the soil cement layer and replacement with conventional granular materials as the base and sub base layers underlying the synthetic turf."[24]   Id. at p. 16.

As of July 13, 2016, Tom VerHelst made repairs to the following number of divots in the field over the course of three years: 2014=38; 2015=883; and 2016=50, for a total of 971 divot repairs.[25]   (Docket 80-1 at p. 2).   Although BHSU used the field for its university football games through 2016, because of problems with the field, other uses by BHSU were curtailed:

   a.   Spring football practice is limited "to no more than 14 days."

   b.   The football team uses a "smaller field on campus or an indoor field on practice days [when the team] is not allowed to use the Field."

   c.   Other events "had to be limited or cancelled altogether."

---

[24]Mr. Smith made the same recommendation.   (Docket 44 ¶ 50) (referencing Docket 43-4 at p. 3).   GSE acknowledged "the current stabilized soil cannot be re-stabilized."   (Docket 46 ¶ 50).   "However, GSE denies that the current soil must be deposed of and replaced."   Id.   While GSE retains the right to challenge the testimony of Mr. Smith, GSE is bound by the testimony of its own expert, Mr. Rettner, and his conclusions.

[25]SGE denies there were "over 800 divots" which " 'had' to be repaired." (Docket 46 ¶ 43(a)).   Yet, Mr. Rettner reported "there are currently several hundred soft areas that have been identified and repaired on the football field." (Docket 43-3 at p. 5).   GSE is bound by the testimony of its own expert, Mr. Rettner.

d. "BHSU no longer contracts to play junior varsity high school football games."   Since 2014 revenue from a total of 10 games has been lost.

e. "BHSU purchased a Raincover Tarp ($21,342.42) to cover the Field [from] mid-November until spring football practice which is mid-March."   The tarp is intended "to protect the Field from any additional moisture outside of the regular freeze/thaw conditions."

f. "As soft spots develop on the Field, areas are marked off by cones and practice/drills are moved to other areas of the Field until soft spots are temporarily repaired."

(Docket 81 ¶ 10(a)-(d)).

## ANALYSIS

The court's jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a).   (Docket 1-1 ¶¶ 2 & 3; 24 ¶ 5; and 27 ¶ 6).   "It is a long-recognized principle that federal courts sitting in diversity apply state substantive law and federal procedural law."   Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co., 559 U.S. 393, 417 (2010) (internal citation and quotation marks omitted).   BHSU and GSE acknowledge the validity, interpretation and performance of the Contract documents is governed by the substantive laws of the state of South Dakota.   (Dockets 1-1 ¶ 8 and 44 ¶ 8). Each of the parties' motions for summary judgment will be separately addressed.

BHSU'S MOTION FOR SUMMARY JUDGMENT

BHSU moves for partial summary judgment against GSE.   (Docket 40 at p. 1).   BHSU seeks summary judgment on its breach of contract claim, "leaving for further determination only BHSU's measure and amount of damages and

[the] remaining counts of breach of implied covenant of good faith and breach of implied warranty of fitness for a particular purpose." Id. at p. 2. BHSU argues "[i]t is undisputed that GSE breached its promises to BHSU" by failing to:

a. provide a "cement stabilized deck" . . . . ;

b. provide a Field that met the Contract specifications . . . . ;

c. provide a properly functioning "vertical-to-horizontal" drainage system . . . . ; and

d. properly repair the Field to Contract specifications . . . .

(Docket 41 at p. 9). Because of GSE's alleged breach of contract, BHSU argues it has suffered damages, in an amount to be subsequently resolved at trial, for the cost "to repair hundreds of soft spots and divots . . . . and . . . to replace the soil cement material under the Field . . . ." Id.

GSE opposes BHSU's motion. (Docket 45). GSE argues the breach of contract claim is barred by the doctrine of accord and satisfaction. Id. at p. 7. GSE contends the Amendment "constitutes an accord, extinguishing the previous obligations and imposing new ones." Id. GSE contends that when it completed the Project as required by the Amendment, that constituted a valid satisfaction. Id.

GSE argues that when Mr. Moths concluded that GSE "provided a sub-surface that meets or exceeds the specifications for the project" that satisfied paragraph 8(G) of the Amendment. Id. at pp. 7-8. According to GSE, further proof of satisfaction of paragraph 8(G) occurred when BHSU's facilities

director "acknowledged that GSE completed the scope of the work as required by the Amended Contract." Id. at p. 10 (referencing Docket 48-7 at pp. 61:4-64:4).

Additionally, GSE argues the breach of contract claim is defeated because "any repair work that presented itself after the completion of the scope of work for the Amended Contract was considered warranty work per the terms of the warranty that was provided to BHSU." Id. GSE submits that following the 2014 work on the field, "BHSU's football team first practiced on the field on August 14, 2014. . . . Thus, any requests for repairs that needed to be completed should have been made pursuant to the requirements set forth in the warranty." Id. at pp. 10-11. "[B]ecause BHSU failed to comply with the incorporated warranty provisions . . . and thus failed to make a valid warranty claim," GSE argues it "had no duty to make any repairs to the field." Id. at p. 11. "Because a 'reasonable jury' could return a verdict for GSE," the defendant argues "it would be improper for this Court to grant BHSU's partial Motion for Summary Judgment." Id.

In rebuttal, BHSU argues there has been no accord, because "GSE fails to identify what 'obligation' BHSU parted with in the Amendment." (Docket 49 at p. 2) (citing SDCL § 20-7-1). BHSU contends "[t]here was no agreement by either party to accept something 'different from that to which' the parties were entitled [under the Contract]." Id. (citing SDCL § 20-7-1). BHSU asserts that "[u]nder the Amendment, GSE was allowed to fulfil its previously failed obligation under the Contract to provide a Field that met the specifications—in return for

22

final payment of the balance under the Contract." Id. (referencing SDCL § 20-7-1). "[B]ecause BHSU was not agreeing to accept something different or less than what was called for in the Contract," plaintiff concludes "GSE cannot establish that the Amendment was an accord." Id. at p. 3.

Even if GSE can "establish an accord," BHSU argues there was "no 'satisfaction'" Id. BHSU submits "[t]here is no 'satisfaction' until the initial 'claim or obligation is extinguished by the actual reception of the amount or thing agreed upon.' . . . It is 'not enough that there be a clear agreement and sufficient consideration, but the accord must be executed.' " Id. (citing Carpenter v. Chicago, M. & St. P. Ry. Co., 64 N.W. 1120, 1120 (S.D. 1895)). BHSU argues "the appropriate means and methods to bring the Field to the Contract specifications would have required GSE to physically remove the unstable and unusable soil and replace it with a properly stabilized base course." Id. at p. 5. BHSU concludes "GSE's agreement to do that which it was already bound and obligated to do cannot constitute a satisfaction." Id. at p. 6 (internal quotation marks omitted).

In South Dakota, "[a]n accord is an agreement to accept, in extinction of an obligation, something different from that to which the person agreeing to accept is entitled." SDCL § 20-7-1. "[T]o constitute an accord and satisfaction, there must be an agreement between [the parties] to extinguish the obligation in a given manner and a compliance with that agreement by the [plaintiff to accept that which is offered by the defendant]." Hubbard Milling Co. v. Frame,

310 N.W.2d 155, 156 (S.D. 1981).   GSE bears the burden to establish that an accord and satisfaction occurred.   Id. at p. 157.   To succeed, GSE must have made it clear that the change in its offer from its obligation under the original contract was being made only on the condition that BHSU take GSE's offer in full satisfaction of the original contract.   Id.

"An accord is an agreement to accept something different or less in discharge of a claim or obligation, and there can be no satisfaction until such claim or obligation is extinguished by the actual reception of the amount or thing agreed upon."   Carpenter, 64 N.W. at 1120.   In this case, "[t]o establish [an] accord and satisfaction . . . it must not only appear that there was an agreement [by BHSU] to accept, in full settlement of an obligation [owed by GSE], something different from or less than that to which [BHSU] is entitled, but it must be shown that such agreement has been fully executed, and the obligation extinguished by the [BHSU's] actual acceptance of the consideration specified in the agreement constituting an accord."   Id.   In other words, in order for there to have been an accord by the execution of the Amendment, BHSU must have agreed to accept "something different from or less than that" which BHSU was entitled to receive under the original Contract.   Id.   The language of the Amendment discloses otherwise.   By the Amendment, GSE agreed to "promptly and in a workmanlike manner commence work on the Field as necessary to conform to the specifications of the [May 30, 2013] Contract Agreement . . . ."   (Docket 43-2 ¶ 3).   The "[m]eans and methods . . . utilized . . . shall be determined solely

by [GSE], subject to completion of work according to [the May 30, 2013] Contract Agreement specifications." Id. ¶ 7.

By the plain and unambiguous language of the Amendment, BHSU was not agreeing to accept "something different from or less than" what GSE had agreed to deliver to BHSU under the original Contract. Carpenter, 64 N.W. at 1120. The court finds as a matter of law that there was no accord. GSE's affirmative defense of accord and satisfaction fails as a matter of law.

On GSE's claim there was an acceptance of the field by BHSU so as to invoke the express warranty, the court makes the following observations and findings based on the undisputed facts. Neither Mr. Moths nor BHSU's facilities director acknowledged that the entirety of GSE's work satisfied its obligation under either the Contract or the Amendment. It is clear both men were expressing their opinions that the grading specification required by the Contract had been met by work performed under the Amendment. Neither individual, nor any other person of authority within BHSU, accepted the final product produced by GSE.

By the undisputed facts presented above, GSE was obligated to "construct an artificial sports field . . . as more fully defined in the [GSE] Proposal dated 13th of May, 2013, attached as Exhibit A and incorporated herein by reference . . . . For the Work defined in the Scope of Work, [BHSU] will pay [GSE] the total sum set forth in the attached [GSE] proposal." (Docket 43-1 at p. 1).

Critical to the present litigation is the Contract requirement that the "cement stabilized deck" be installed "8 [inches] thick by 8% volume (if [plasticity index] of material is acceptable or as determined by geotechnical engineer)." Id. at p. 5. Knowing organic materials in the soil would have a significant impact on the success of cement stabilization, GSE did not use a pre-construction mix design to test for pH, organic content and plasticity. Rather, GSE concluded the soil was acceptable for cement stabilization. Whether that decision was made independently by GSE or was based wholly or in part on FMG's report is not material to BHSU's breach of contract claim. GSE represented to BHSU that the soil could be properly stabilized using the concentration of cement specified in GSE's proposal and the Contract.

It is Mr. Rettner's opinion that the volume of cement used was inadequate because of the presence of organic materials in the soil and its plasticity. Additionally, because of the moisture content of the cement induced soil has actually increased from the time of construction, Mr. Rettner concluded the material under the turf will continue to deteriorate and lose stability. The undisputed and uncontroverted opinions of Mr. Rettner and Mr. Smith are that the cement stabilization failed.[26]

The repairs which occurred over the past four years are not the minor repairs contemplated by the Contract documents or the warranty. Under the

---

[26]GSE's report from Mr. Rettner came to the same conclusions as Mr. Smith's report. Compare Dockets 43-3 & 43-4.

Contract and the incorporated Maintenance Requirement Manual, "minor repairs" are described as follows:

> An open spot in a seam, where the loose area in the seam extends from a few inches to two feet along a glued seam line (where at least one of the turf edges is still attached to the seam tape). . . . [or] [c]uts, rips or tears in the surface fabric that are less than six inches or so in length do not generally require the insertion of seam tape. These can also be regarded as minor unless allowed to become larger. Sewing or adhering the repairs can handle all of these problems.

(Docket 43-1 at p. 20). To repair minor seam openings or loose seam areas, GSE recommended the following activities:

1) Vacuum rubber from the turf to be repaired.

2) Be sure that the fabrics to be adhered are dry, free from loose rubber, dirt, old adhesive and other foreign matter.

3) Clean the area to be repaired and wipe the opening with methyl-ethyl-ketone (MEK), toluene, or if neither is available, with mineral spirits.

4) Position the fabric to check for satisfactory final placement.

5) Be sure the seaming tape to which the fabric will be adhered is itself adhered to the underlying pad.

6) Trowel a small amount of adhesive from an adhesive bottle on to the seaming tape. Avoid excessive adhesive to reduce the possibility of bleed through or bleed out. Spread the adhesive with a knife or trowel so that the entire fabric is coated lightly and evenly.

7) Press the fabric into the adhesive bed uniformly.

8) Weigh down the area and allow curing for at least 24 hours.

9) Spread rubber on the repaired area and brush into the turf thoroughly until even with surrounding playing areas.

Id.

This minor repair guide makes no mention of removing cement induced soil and replacing it with either cement or more cement induced soil. GSE knew the repair of several hundred divots was outside the type of repairs contemplated by the manual or the warranty when GSE acknowledged the field was not installed to the specifications of the Contract and returned several times over the course of two years to attempt a patch-work solution.

There is no merit to GSE's declaration that the warranty, as of July 25, 2013, was BHSU's sole and exclusive remedy. The warranty and its provisions never went into effect. While BHSU may have attempted to mitigate its damages by its partial use of the athletic field, GSE failed to provide BHSU with the product contemplated by the Contract documents. GSE never fully performed under the Contract. GSE's effort to impose the warranty as BHSU's exclusive remedy fails as a matter of law.

The court finds that the undisputed material facts compel a conclusion that GSE breached its contract with BHSU. Anderson, 477 U.S. at 256. No reasonable jury could find for GSE on BHSU's breach of contract claim. Id. The court grants plaintiff's motion for partial summary judgment.

GSE'S MOTION FOR SUMMARY JUDGMENT

A. ACCORD AND SATISFACTION AND WARRANTY

GSE asserted two of the same arguments in resistance to plaintiff's motion for partial summary judgment as the basis for GSE's own motion for summary judgment. (Docket 56). Those are the accord and satisfaction and warranty

claims.  Id. at pp. 7-13.   For the reasons stated above, GSE's motion for summary judgment on those grounds is denied.

### B.  IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

GSE additionally asserts it is entitled to summary judgment arguing that "South Dakota does not recognize an independent tort for breach of the implied covenant of good faith and fair dealing."   Id. at p. 13 (citing Haanen v. North Star Mutual Ins. Co., 1:16-CV-01007, 2016 WL 6237806, at *2 (D.S.D. Oct. 25, 2016) (quoting Nygaard v. Sioux Valley Hospitals & Health Systems, 731 N.W.2d 184, 193 (S.D. 2007) (quoting Farm Credit Services of America v. Dougan, 704 N.W.2d 24, 28-29 (S.D. 2005) (other citations omitted).

BHSU's response acknowledges that a "breach of the implied covenant of good faith and fair dealing is not an independent tort; indeed BHSU does not seek to recover on this count under a tort theory of liability."   (Docket 78 at p. 13).   BHSU argues count II of its complaint is made because "[t]he good faith doctrine exists in connection with the existence of a contract: one party may sue for breach 'when the other contracting party, by its lack of good faith, limited or completely prevented the aggrieved party from receiving the benefit of the bargain.' "   Id. (citing McKie v. Huntley, 620 N.W.2d 599, 602 (S.D. 2000)).

The parties correctly cite the law.   While "South Dakota does not recognize an independent tort action for breach of the implied covenant of good faith and fair dealing," South Dakota does acknowledge that "every contract contains an implied covenant of good faith and fair dealing that prohibits either

contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract, [and] the duty of good faith permits an aggrieved party to bring a breach of contract action . . . ."  Haanen, 2016 WL 6237806, at *2 (internal citation and quotation marks omitted).  See also McKie, 620 N.W.2d at 602 ("the good faith doctrine simply allows one party to sue for breach when the other contracting party, by its lack of good faith, limited or completely prevented the aggrieved party from receiving the . . . benefits of the bargain.") (internal citation and quotation marks omitted).

Whether GSE acted with a lack of good faith by not ordering the tests which Mr. Rettner recommended and ultimately performed or by failing to notify BHSU that the cement stabilization system failed at installation are questions of fact which only a jury can resolve at trial.  Anderson, 477 U.S. at 247-48. GSE's motion for summary judgment on plaintiff's claim in count II of the complaint is denied.

## C.  IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

GSE's next basis for its motion for summary judgment challenges plaintiff's claim in count III of the complaint "that GSE breached the implied warranty of fitness for a particular purpose in connection with the Project . . . ." (Docket 56 at p. 14) (internal quotation marks omitted).  GSE argues it "is entitled to summary judgment on this claim because the Contract . . . is (1) not a contract for the sale of goods under the [Uniform Commercial Code "UCC"], and (2) contains an express exclusion of any warranty aside from the one included in

30

the contract." Id. GSE asserts the Contract "is a service contract and not a contract for the sale of goods." Id. (bold omitted). GSE contends the Contract made it "responsible for providing the labor and materials necessary to construct an artificial sports field . . . [so] [t]he predominant purpose of this Contract was the rendition of a service with good [sic] incidentally involved." Id. at p. 16 (emphasis omitted) (citing Hayward Baker, Inc., v. Shirttail Gulch Road District, Inc., Civ. No. 10-5012, 2012 WL 3929211, at *4 (D.S.D. Sept. 10, 2012). GSE acknowledges it "did provide various raw materials, such as artificial turf, backing, and rubber infill," but argues those materials "were incidental to the service provided—the construction of a football field." Id. Because the Project involves "a contract for construction," GSE contends it "is not subject to the UCC." Id. Finally, GSE contends "the football field could hardly have been considered to be 'moveable' at the time that GSE and BHSU entered into the contract. Thus, it cannot be considered a 'good' under the UCC. Id.

Even if the court concludes the contract is subject to the UCC, GSE argues plaintiff's claim for "breach of implied warranty of fitness for a particular purpose still must fail." Id. at p. 17. Because "the Contract specifically includes a provision limiting the warranty," GSE asserts the warranty qualified to exclude any implied warranty of fitness. Id. (referencing SDCL § 57A-2-316).

BHSU argues GSE's motion for summary judgment is based "exclusively upon the Warranty portion of the Contract, which provides, in part, the warranty would become effective upon or triggered by BHSU's 'acceptance or first use of

31

the finished sports field . . . .' " (Docket 78 at p. 14) (referencing Docket 43-1 at p. 2). Because BHSU "never accepted the field or received a 'finished sports field,' " BHSU contends the warranty never became effective. Id. at p. 15.

BHSU argues GSE's reliance on SDCL Chap. 57A is misplaced. Id. BHSU contends that "[i]ndependent of the UCC, the law recognizes express and implied warranties in construction contracts." Id. (referencing Waggoner v. Midwestern Development, Inc., 154 N.W.2d 803, 807 (S.D. 1967) ("[W]here a person holds himself out as especially qualified to perform work of a particular character there is an implied warranty that the work shall be done in a reasonably good and workmanlike manner and that the completed product or structure shall be reasonably fit for its intended purpose.") (emphasis omitted). Because GSE is a professional engineering firm, BHSU submits GSE expressly held itself out as competent to complete the Project. Id. at p. 17. BHSU argues it "did not prepare designs or specifications for the project, but rather specifically relied upon the expertise of GSE," thus supporting a claim of an implied warranty of fitness for a particular purpose. Id. at p. 17. Even if the court applies the UCC, BHSU contends "GSE is not entitled to summary judgment because there is a question of fact as to whether its so-called disclaimer is unconscionable." Id.

The court already concluded as a matter of law that GSE's warranty never went into effect. GSE's argument its warranty specifically bars plaintiff's implied warranty claim is without merit. "An implied warranty arises under

certain circumstances by operation of law and [is] intended to hold vendors to a course of fair dealing." Waggoner, 154 N.W.2d at 807. "Implied warranties do not rest upon any supposed agreement in fact. They are obligations which the law raises upon principles foreign to the actual contract; principles which are strictly analogous to those upon which vendors are held liable for fraud. It is for the sake of convenience, merely, that this obligation is permitted to be enforced under the form of a contract." Id. (internal citation and quotation marks omitted). "As a general rule . . . where a person holds himself out as especially qualified to perform work of a particular character there is an implied warranty that the work shall be done in a reasonably good and workmanlike manner and that the completed product or structure shall be reasonably fit for its intended purpose." Id. "These principals are particularly applicable where plans are furnished [by the vendor]." Id. "[W]here in the sale of a [new construction] the vendor is also a builder of [that type of construction] there is an implied warranty of reasonable workmanship . . . . The builder is not required to construct a perfect [structure] and in determining whether a [structure] is defective the test is reasonableness and not perfection. . . . The duration of liability is likewise determined by the standard of reasonableness." Id. at 809. "Breach of an implied warranty with respect to the construction of improvements to real property is . . . a wrong recognized by [South Dakota]." Mitchell School District No. 17-2 v. Welfl Construction Co., 329 N.W.2d 138, 140 (S.D. 1983) (Henderson, J., dissenting) (referencing Waggoner, 154 N.W.2d 803) *overruled on other*

*grounds by* <u>Daugaard v. Baltic Co-op. Building Supply</u> <u>Association</u>, 349 N.W.2d 419 (S.D. 1984)).

BHSU states a viable claim in count III of its complaint that GSE breached an implied warranty of fitness for a particular purpose. It remains a question for the jury to resolve whether GSE actually breached the implied warranty. GSE's motion for summary judgment on this basis is denied.

D. RESCISSION

GSE's final ground for summary judgment challenges BHSU's claim in count IV of its complaint seeking rescission of the Contract. (Docket 56 at p. 18). GSE contends that as a matter of law "BHSU cannot argue that there was a partial or total failure of consideration, or that the consideration given by GSE was void." <u>Id.</u> at p. 19. GSE asserts BHSU used the field during the past four years and "has 'derived a benefit' and continues to do so from the consideration provided by GSE." <u>Id.</u> (citing <u>Bankwest, Inc. v. Valentine</u>, 451 N.W.2d 732, 735 (S.D. 1990)). GSE argues "[t]o allow BHSU to rescind the contract would be inequitable to GSE. The life expectancy of an artificial turf field is eight years and BHSU has already benefited from half of it. . . . Thus, if the contract is rescinded, BHSU would be allowed to continue to benefit from the field for the remainder of its life expectancy at no cost." <u>Id.</u> GSE contends that "[t]he fact that BHSU has a usable field shows that any alleged failure [on GSE's part] did not 'defeat the very object of the contract.' " <u>Id.</u> (citing <u>Dusek v. Reese</u>, 119 N.W.2d 656, 660 (1963)). GSE argues "BHSU cannot provide 'clear and

convincing evidence' to show that it is entitled to the 'extraordinary remedy' of rescission." Id. (citing Knudsen v. Jensen, 521 N.W.2d 415, 418 (S.D. 1994)).

BHSU contends GSE's motion is groundless. (Docket 78 at p. 19). BHSU argues "GSE's failure to provide: a safe field, a cement stabilized base, tape that holds the panels together, etc., which required BHSU to spend years repairing over 800 problems and ultimately will require approximately $1,500,000 to remedy can hardly be described as a casual, technical, or unimportant breach or failure of performance." Id. (internal citations and quotation marks omitted).

In South Dakota, a contract may be rescinded only in limited circumstances. SDCL § 21-12-1. In this case, the only basis for rescission under § 21-12-1 rests on that provision's reference to SDCL § 53-11-2.[27] That statute, as applicable to the facts in this case, permits a contracting party to rescind a contract "only . . . [i]f through fault of the party as to whom he rescinds, the consideration for his obligation fails in whole or in part [or] . . . [i]f the consideration becomes entirely void from any cause . . . ." SDCL § 53-11-2(2) & (3). In other words, BHSU is only permitted to rescind the Contract if, through the fault of GSE, the consideration for BHSU's obligation "fails, in whole or in part," or if the "consideration becomes entirely void." Id.

"An action for rescission may be brought as a legal action pursuant to SDCL ch. 53-11, or as an equitable action pursuant to SDCL ch. 21-12."

---

[27]Neither BHSU nor GSE argue subsections (2) or (3) of SDCL § 21-12-1 are applicable to the facts of this case.

Knudsen, 521 N.W.2d at 417. "[T]he grounds for legal rescission, SDCL 53-11-2 are incorporated into the grounds for equitable rescission, SDCL 21-12-1." Northwest Realty Co. v. Carter, 338 N.W.2d 669, 671 n.1 (S.D. 1983). "If the action is in equity, the rescission is accomplished by court decree." Knudsen, 521 N.W.2d at 417 (internal citation omitted). "Rescission is equitable if the complaint asks the court to order rescission of a contract. It is legal, if the court is asked to enforce a completed rescission." Skoglund v. Staab, 312 N.W.2d 29, 31 (S.D. 1981). Count IV of BHSU's complaint[28] asks the court to enter a judgment of rescission, making this an action in equity. Northwest Realty Co., 338 N.W.2d at 672.

"Generally, equity will not take jurisdiction to declare a rescission where a party has an adequate and complete remedy at law." Id. "[A]lthough a party may not rescind if he has an adequate remedy at law, the party is entitled to rescission in case of a breach going to the very basis of the contract." Id. (referencing Dusek, 119 N.W.2d 656; other reference omitted). "[R]escission of a contract is not generally permitted for a casual, technical, or unimportant breach or failure of performance, but only for a breach so substantial as to tend to defeat the very object of the contract. . . . The same principle applies to rescission based upon partial failure of consideration . . . . Such a breach must also be substantial or relate to a material part of the contract." Dusek, 119 N.W.2d at 660. "The equitable relief of rescission, being extraordinary, should never be granted,

---

[28]Docket 1-1 at p. 10.

except where the evidence is clear and convincing." <u>Mattson v. Rachetto</u>, 591 N.W.2d 814, 818 (S.D. 1999) (internal citation omitted).

"Consideration for a contract may not be other than that which is accepted or regarded as such by both parties." <u>Bankwest, Inc.</u>, 451 N.W.2d at 735. For there to be a "total failure of consideration" the party making that claim must have "derived no benefit from the contract." <u>Id.</u> (internal citation omitted). The consideration in the present case is clear: in exchange for the payment of $518,910, GSE promised to provide BHSU with "an artificial sports field" as a "finished project." (Docket 43-1 at p. 1). While BHSU is dissatisfied with the ultimate condition of the athletic field, it did derive significant benefit from the Contract. BHSU played four seasons of college football, including some practices and all of its home football games, on the field. This does not constitute a total deprivation of the consideration BHSU expected from GSE's work. Since BHSU's breach of contract claim for money damages will compensate it for the defects in the athletic field, BHSU has an adequate remedy at law, thus barring the remedy of rescission. <u>Northwest Realty, Co.</u>, 338 N.W.2d at 672-73.

The court finds that BHSU is not entitled to proceed with rescission of the Contract under count IV. GSE's motion for summary judgment as to that count of the complaint is granted.

MIDSTATE'S MOTION FOR SUMMARY JUDGMENT

Midstate filed a motion for summary judgment seeking dismissal of all claims asserted against it by the third-party plaintiff, GSE.    (Docket 58).

GSE's complaint against Midstate alleges in count I, a claim for indemnity, and in count II, a claim for contribution.    (Docket 24 at pp. 5-7).    GSE alleges it is "entitled to indemnification and/or contribution . . . for Midstate's acts . . . ."    Id.

¶ 30.    Those acts are alleged to constitute negligence by failing to:

    a.    properly analyze geotechnical soils testing results to determine whether the soils at the site were suitable for the proposed application - - to be chemically stabilized for use as a subgrade on which an artificial turf surface and related drainage and shock absorption components would be placed;

    b.    advise or inform GSE that the geotechnical testing information which GSE provided to Midstate was inadequate to permit a determination to be made as to whether the soils would be suitable for the proposed use, or whether additional or different testing was necessary to permit such analysis;

    c.    advise GSE that the proposed design mix for the cement stabilization process was in any way deficient or needed to be adjusted or changed due to the soil characteristics described in the geotechnical testing reports which GSE provided to Midstate;

    d.    advise or inform GSE that Midstate would require GSE to provide a design mix for the proposed cement stabilization project from a person or entity with expertise in geotechnical soils analysis sufficient to properly determine the appropriate stabilization chemicals to be used, the appropriate quantities of those chemicals, and any other specifications necessary to prepare the soil for the proposed application - - for use as a subsurface for the artificial turf and related components; [and]

    e.    alert or inform any GSE personnel that the soil at the site might be unsuitable for the proposed cement stabilization

process to prepare the soil for the anticipated application after Midstate personnel visually and physically observed the soils at the site and formed the impression that the soils may be unsuitable for that application.

Id. ¶ 30(a)-(e).   GSE does not allege Midstate breached the subcontract.   See Dockets 24 & 70.

Midstate argues its only relationship with "GSE arises solely out of the subcontract . . . . [and] [a]ny duties that Mid-State owes to GSE can only arise from its contract."   (Docket 60 at p. 10).   Midstate asserts "[w]here a defendant is charged with negligence because of his failure to perform an act allegedly required by contract, the question of whether the defendant had a duty to perform the act usually must be determined from the terms of the contract.   The defendant's duty will not be extended beyond the duties described in the contract."   Id. (emphasis omitted) (citing Fisher Sand & Gravel Co. v. State By & Through South Dakota Department of Transportation, 558 N.W.2d 864, 868 (S.D. 1997)).   Midstate contends the subcontract's scope of work specifically excluded "mix design," "testing" and "coring."   Id. at p. 13 (referencing Docket 62-2 at p. 8).   Midstate argues "GSE is attempting to impose an extraneous non-contractual obligation on Midstate to provide analysis and information relative to test results.   Not only is this outside Midstate's scope of work pursuant to the terms of the subcontract, but these allegations are also entirely refuted by the undisputed facts in the record."   Id.   "Because no independent legal duty exists based on these undisputed facts," Midstate submits it "is

entitled to summary judgment . . . on all claims brought by GSE in its Third Party Complaint." Id. at p. 14.

GSE opposes Midstate's motion for summary judgment. (Docket 70). GSE contends Midstate "agreed to provide professional services to GSE." Id. at p. 5. GSE argues this professional services arrangement occurred because when Mr. Kahnke, as Midstate's employee, arrived at the field "he immediately noticed that there may be issues with the method in which GSE was proceeding with the project." Id. at pp. 5-6. GSE submits Mr. Kahnke "made this realization as a professional, familiar with the issues, and he should have notified GSE of the potential for a problem." Id. at p. 6. GSE argues Midstate already established a relationship with GSE because Midstate analyzed the geotechnical information given to it by GSE and then "worked with GSE to determine how and when the subsurface would be prepared by Midstate." Id. "Because of this relationship and the extraneous circumstances surrounding it," GSE contends "a legal duty, independent from the terms of the contract, arose on the part of Midstate." Id. "By not voicing his concerns regarding the suitability of the soil for cement-stabilization," GSE asserts Midstate "performed work which [Mr. Kahnke] knew would likely fail." Id.

In its response, Midstate argues it was not providing professional services to GSE so as to create a claim for professional negligence. (Docket 76 at p. 5). Midstate submits it never held itself out as an expert "and matters pertaining to

soil testing and mix design were therefore specifically excluded from Mid-State's contractual scope of work." Id. at p. 9.

"If one in good faith fully complied with the contract, one cannot be held liable for actions arising out of the contract under a theory of negligence." Fisher Sand & Gravel Co., 558 N.W.2d at 869. "[W]hen a contracting party does not act in good faith under the contract, the other party has a remedy under the contract for breach thereof but no independent tort cause of action exists for the same claim." Id. at 868 (referencing Garrett v. BankWest, Inc., 459 N.W.2d 833, 843 (S.D. 1990)). "Rights are not to be determined by playing a game of labels. If the relationship of the parties is such as to support a cause of action in tort, that cause of action is not to be denied because the parties happened also to have made a contract. Conversely, a breach of contract is not, standing alone, a tort as well. And it cannot be converted into a tort merely by attaching to the contract, or to the breach, new labels that sound in tort." Id. (internal citation omitted).

"In order to prevail in a suit based on negligence, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury . . . . Whether a duty exists is a question of law . . . ." Id. at 867. "Tort liability requires a breach of a legal duty independent of contract." Schipporeit v. Khan, 775 N.W.2d 503, 505 (S.D. 2009) (internal citation and quotation marks omitted). "This independent legal duty must arise from extraneous circumstances, not constituting elements of the contract." Id. (internal citation

41

and quotation marks omitted). "Consequently, an independent legal duty must extend beyond a contract's implied covenant of good faith and fair dealing." Id.

Engineers and architects are generally considered subject to claims of professional negligence. Lien v. McGladrey & Pullen, 509 N.W.2d 421, 423 (S.D. 1993). While Midstate's services may certainly be classified as technical in nature, the subcontract specifically excluded any obligation on Midstate's part to provide GSE with opinions on soil composite, plasticity, pH, or the ratio of cement to soil necessary to satisfy GSE's obligations to BHSU under the Contract. GSE specifically contracted with Midstate to integrate 180 tons of concrete into the soil and create an 8", 8 percent by volume subsurface of concrete stabilized soil. GSE did not expect to rely on Midstate for its opinions as to the soil's composition.

The duty owed by Midstate to GSE arose solely from the subcontract. Midstate was not hired by GSE to conduct any soil testing or other geotechnical activities and Midstate never volunteered to perform those activities. GSE relied solely on its own interpretation of the FMG report and directed Midstate as to the proper ratio of cement and soil to be integrated into the cement stabilization. The "contract between these parties created their rights and obligations. These duties are implied by the parties' own promises, and not imposed by law." Fisher Sand & Gravel Co., 558 N.W.2d at 868. GSE "has not demonstrated that [Midstate] breached any duties, rights, or obligations independent of those imposed upon [it] under the contract." Id.

The court finds as a matter of law that the services provided by Midstate created no legal duty independent of the subcontract. Midstate's motion for summary judgment as to GSE's third-party complaint is granted.

FMG'S MOTION FOR SUMMARY JUDGMENT

GSE's third-party complaint against FMG asserts in count I, a claim for contribution, and in count II, a claim for professional negligence.[29] (Docket 27 at pp. 5-9). FMG moves for summary judgment on both counts. (Docket 63). The basis for FMG's motion is succinct:

> From the beginning the FMG work was limited. . . . Its proposal, returned in response to the BHSU request, clearly stated that the job was to run certain specified tests, returning the results to BHSU who would relay them to others. . . . There has never been any criticism or quarrel with the methodology or the results of the tests.

(Docket 64 at p. 2). Accordingly, FMG argues "[n[o explanation was provided FMG as to why the tests were to be run for this particular turf installation. . . . There is an absence of any evidence to show that FMG had any knowledge of mix designs; the relationship between the test results; the cement mix soil stabilization plan; or any other alternatives." Id. at pp. 4-5. FMG contends the "foreseeability [of harm] required under the present South Dakota case law is absent. It is the absence of a 'trigger' fact(s) there that stands out—the missing

---

[29]FMG's brief suggests GSE's third-party complaint includes a claim of "ordinary negligence." (Docket 64 at p. 4) (referencing Docket 27 ¶¶ 19-23). The third party complaint's counts are captioned as stated in the body of this order. In addition, GSE's prayer for relief seeks judgment only on its "contribution claim" and "common law professional negligence claim." (Docket 27 at p. 9 ¶¶ A & B). The court finds no "ordinary negligence" claim is asserted by GSE against FMG.

request for an opinion or design or analysis and the well defined tasks set forth in the beginning." Id. at p. 5 (referencing Mid-Western Electric, Inc., v. DeWild Grant Reckert & Associates, Co., 500 N.W.2d 250, 254 (S.D. 1993)).

GSE resists FMG's motion. (Docket 73). GSE submits that the proposal submitted by FMG put it on notice of the nature of the Project and why soil testing was to be performed. Id. at p. 2. FMG's proposal contained the following language:

> We understand artificial turf is being considered for Lyle Hare Stadium. A potential turf supplier/installer has suggested cement stabilization of the existing turf subgrade to provide the required base for the artificial turf. We understand laboratory testing and classification of the turf subgrade is required for the turf supplier/installer to determine the applicability of cement stabilization to this project. This proposal outlines our project approach and costs to sample and test the existing turf subgrade.

(Docket 75-1 at p. 1). GSE contends that "[u]nbeknownst to BHSU and GSE, FMG did not have any experience with the cement-stabilization process, nor did FMG advise that additional or different testing should be completed." (Docket 73 at p. 2).

GSE argues "[i]t was foreseeable [to FMG] that GSE would rely on the testing results provided by FMG to determine whether cement stabilization was appropriate, especially since the proposal specifically referenced both GSE and the reason the testing was being completed." Id. at p. 3. Because GSE was "a foreseeable third party," it asserts "FMG had a duty to act as a reasonable geotechnical engineer would and advise GSE that more extensive testing should

44

have been completed to ensure that the soil was suitable for cement stabilization. FMG breached its duty by failing to do so." Id. at p. 5.

GSE relies on the opinions of Mr. Rettner who "testified that had he been in the position of FMG, he would have advised his client that additional testing should have been completed to determine whether the soil was appropriate for cement stabilization." Id. GSE contends "Mr. Rettner's testimony . . . presents a clear factual dispute as to whether FMG breached its duty to GSE." Id. at p. 7. For this reason, GSE submits FMG's summary judgment motion should be denied.[30] Id.

In "South Dakota[,] a cause of action exists for economic damage for professional negligence beyond the strictures of privity of contract." Mid-Western Elec., Inc., 500 N.W.2d at 254. "[T]rial courts [are instructed] to use the legal concept of foreseeability to determine whether a duty exists." Id. If a contractor or subcontractor is expected to use an engineering firm's report to complete a project, it is foreseeable that the contractor or subcontractor could be harmed by the firm's professional negligence. Id.

The language of the proposal submitted by FMG identified the very purposes for testing. FMG's proposal outlined its approach for addressing the issues presented. The court finds GSE has established a genuine question of material fact as to whether FMG, as a professional engineering firm, was obligated to advise BHSU and GSE that FMG had no prior experience with

---

[30]As stated earlier in this order, FMG did not file a reply brief in support of its motion for summary judgment.

cement stabilization and whether additional tests should be performed on the Lyle Hare Field soil before cement stabilization commenced.   <u>Anderson</u>, 477 U.S. at 247-48.   FMG's motion for summary judgment is denied.

## ORDER

Based on the above analysis, it is

ORDERED that the motion for partial summary judgment (Docket 40) of plaintiff South Dakota Board of Regents, on behalf of Black Hills State University, against defendant Global Synthetics Environmental, LLC, is granted.

IT IS FURTHER ORDERED that defendant Global Synthetics Environmental, LLC, breached the contract with plaintiff as asserted in Count I of plaintiff's complaint.   Plaintiff's claim for money damages, if any, for breach of contract will be resolved at trial.

IT IS FURTHER ORDERED that the motion for summary judgment (Docket 54) of defendant Global Synthetics Environmental, LLC, against plaintiff South Dakota Board of Regents, on behalf of Black Hills State University, is granted in part.   Plaintiff's claim for rescission in Count IV of the complaint is dismissed with prejudice.   Defendant's motion for summary judgment on Counts II and III of the complaint is denied.

IT IS FURTHER ORDERED that the motion for summary judgment (Docket 58) of Midstate Reclamation S.D., Inc., against third-party plaintiff Global Synthetics Environmental, LLC, is granted.

IT IS FURTHER ORDERED that the third-party complaint of Global Synthetics Environmental, LLC, (Docket 24) against third-party defendant Midstate Reclamation S.D., Inc., is dismissed with prejudice.

IT IS FURTHER ORDERED that the motion for summary judgment (Docket 63) of FMG, Inc., is denied.

Dated September 15, 2017.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE